THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, that participate on marine cargo policy no. B0799MC030730k, foreign corporations,<br><br>Plaintiffs,<br><br>v.<br><br>MILLS BROS. INTERNATIONAL, INC., dba GLOBAL HARVEST FOODS, LTD., a Washington corporation,<br><br>Defendant. | CASE NO. C18-1661-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiffs' motion for partial summary judgment (Dkt. No. 22). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

**I.    BACKGROUND**

**A.    Factual Background**

Plaintiffs are a group of syndicates who proportionally subscribe to or provide capital to underwrite Marine Cargo Insurance Policy No. B0799MC030730k (the "Policy"). (Dkt. No. 1 at 1.) Plaintiffs issued the Policy to Defendant on July 24, 2017, with one amendment executed on

October 21, 2017. (*See* Dkt Nos. 1, 1-1.) The effective dates of the Policy were August 1, 2017 to August 1, 2018. (Dkt. No. 1-1 at 4.) Defendant timely paid the premiums due on the Policy. (Dkt. Nos. 16 at 5, 18 at 2.)

Defendant manufactures bird seed products, including "pressed seed products." (Dkt. Nos. 1 at 4, 28 at 6.) Pressed seed products are formed using gelatin, dried to reduce moisture, and then packaged for sale. (Dkt. No. 28 at 6.) For many years, Defendant used an oven heating method to reduce moisture in its pressed seed products. (*See* Dkt. Nos. 1 at 4–5, 16 at 3.) This method reduced moisture in the pressed seed products by at least three percent. (Dkt. Nos. 22 at 7, 28 at 6–7.)

Defendant sought advice as to how to increase its manufacturing capacity, and an expert advised Defendant that it should replace the oven with a spiral cooling drying system (the "spiral dryer"). (Dkt. No. 28 at 6–7.) Through research, Defendant learned that spiral dryers "had widespread utilization in food processing." (*Id.* at 6.) Defendant's gelatin suppliers informed Defendant that a spiral dryer "would be preferable." (*See id.* at 6–7.) Defendant negotiated a warranty with a spiral dryer supplier to obtain a guarantee of at least a three percent extraction of moisture from the pressed seed product. (*Id.* at 7.) Defendant alleges it tested the spiral dryer and received positive results, and in April 2018 "beg[a]n commercial production using its new spiral dryer, utilizing the exact same process as [Defendant's] plant ha[d] used for more than 14 years." (*Id.*; *see also* Dkt. No. 30 at 2.)

In June 2018, several customers reported mold on Defendant's pressed seed products. (Dkt. No. 28 at 7.) Defendant claims that mold was discovered on about 28 percent of the pressed seed products in its warehouse, in transit, and at third-party locations. (*Id.*) Plaintiffs claim that the mold was discovered on some of the inventory at Defendant's warehouse facilities. (Dkt. No. 1 at 5.) After discovering the mold, Defendant reverted to using the oven heating method for at least some of its pressed seed products. (*See id.*, Dkt. No. 16 at 3.) On July 26, 2018, Defendant submitted a Property Loss Notice to Plaintiffs, reporting that a loss occurred on

June 22, 2018. (Dkt. Nos. 22 at 6–7, 23-1 at 2.) Defendant submitted a claim exceeding $511,000 to Plaintiffs for reimbursement (the "Claim"), which included alleged losses of at least $300,000 in unsalable products and $175,000 in reimbursements to clients. (Dkt Nos. 1 at 5, 28 at 7.)

Plaintiffs hired insurance adjuster Charles Colella of EIMC to investigate the Claim, and Colella submitted two reports to Plaintiffs. (Dkt Nos. 16 at 5, 18 at 2, 22 at 9.) On or about August 15, 2018, Colella determined that Defendant incurred costs of $511,633.02. (Dkt. Nos. 16 at 5, 18 at 2.) The parties dispute whether Colella concluded that Plaintiffs were liable to Defendant for reimbursement of those costs. (*See id.*) Defendant alleges that Plaintiffs "demanded that the adjuster reverse his coverage conclusion, but he refused to do so." (Dkt. No. 16 at 5.) Defendant also alleges that "[o]n or about November 2, 2018, [Plaintiffs'] agent, [broker] Lonmar Global Risks Limited [("Lonmar")], also confirmed that the [C]laim was covered." (*Id.*) Plaintiffs deny both allegations. (*See* Dkt. No. 18 at 2.)

### B. Relevant Policy Provisions

The Policy is governed by Washington law. (Dkt. No. 1-1 at 7.) The Policy covers "[a]ll risk of physical loss or damage from whatsoever cause howsoever arising" subject to the Policy conditions and clauses (the "all-risk language"). (*Id.* at 5.) The Policy applies to "[a]ll goods . . . incidental to the business of [Defendant] or in connection therewith . . . ." (*Id.* at 4.) The Policy covers shipments from "[p]orts and/or places in North America" to "[p]orts and/or places in the World and/or vice versa . . . Including whilst at rest and/or in store and /or whilst at contractors." (*Id.*) Coverage attaches:

> from the time [Defendant] assumes an interest in and/or responsibility for the subject matter insured and continues uninterrupted, including transit, stock and location coverage until that interest and/or responsibility ceases.

(*Id.* at 5.) The Policy contains a process exclusion clause (the "exclusion clause"), that provides:

> Stock/Location coverage (other than in the normal course of transit and/or whilst at third party locations) shall exclude the following: . . .
>
> b) Loss and/or damage to the subject matter hereby insured caused by processing, errors in processing and/or as a direct result of being worked upon unless due to an external cause otherwise covered by this policy.

(*Id.* at 6.) The Policy also states, "Whenever a conflict arises between General and/or subscription and/or Particular Conditions of this policy, the conditions most favourable to [Defendant] shall apply" (the "favorability clause"). (*Id.*) The Policy's "atmospheric conditions clause" states that:

> In the event of goods insured under this policy being wetted or exposed to any odour and/or wetting occurring during the protection of the insurance . . . the extra expenses of drying and/or reconditioning will be reimbursed by [Plaintiffs]. In the event the goods cannot be reconditioned, the liability of [Plaintiffs] shall be to pay the insured value of the affected goods.

(*Id.* at 10.)

### C. Procedural History

Plaintiffs filed a complaint for declaratory relief, seeking an order stating that Defendant's losses from the mold are not covered by the Policy and that Plaintiffs are not liable to pay the Claim because the mold resulted from a processing error and thus falls under the exclusion clause. (*See* Dkt. No. 1 at 5–6.) Defendant answered and asserted counterclaims for: breach of contract; breach of the covenant of good faith and fair dealing; negligence; bad faith; and violations of the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86 *et seq*. (*See* Dkt. No. 15.) Defendant amended its answer to add a counterclaim for violations of the Washington Insurance Fair Conduct Act ("IFCA"), Wash. Rev. Code §§ 48.30.101, 48.30.015, Wash. Admin. Code §§ 284-30-330, 350–80. (*See* Dkt. No. 16 at 7.)

Plaintiffs move for partial summary judgment, claiming that the mold resulted from a processing error because "[t]he dryer simply did not process the bird seed in the way [Defendant] wanted it to" by "fail[ing] to remove the proper amount of moisture from the bird seed," thus rendering the Claim ineligible for coverage under the Policy. (Dkt. No. 22 at 13.) Plaintiffs also request that the Court dismiss Defendant's breach of contract and IFCA counterclaims as a matter of law. (*See id.* at 19.) Defendant opposes Plaintiffs' motion, and in the alternative moves

for a continuance pursuant to Federal Rule of Civil Procedure 56(d). (Dkt. No. 28 at 24–26.)[1]

## II. DISCUSSION

### A. Summary Judgment Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant has the initial burden of showing the absence of a genuine dispute of material fact, supported by materials such as the pleadings, depositions, admissions on file, and any affidavits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). If the movant meets this burden, then the nonmovant must demonstrate, from more than the pleadings alone, a genuine dispute of material fact. *Celotex*, 477 U.S. at 324.

Facts are considered material if they "might affect the outcome of the suit under the governing law," so material facts are more than irrelevant or unnecessary under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence could lead a reasonable jury to return a verdict for the nonmovant. *Id.* Thus, the evidentiary standard for summary judgment is identical to that applied at a trial on the merits under Federal Rule of Civil Procedure 50. *Id.* at 251–52. However, a nonmovant need not produce evidence that would be admissible at trial to avoid summary judgment. *Celotex*, 477 U.S. at 324. The Court must view the facts and reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255.

---

[1] Defendant argues that Plaintiffs did not support their motion for partial summary judgment with admissible evidence because Colella's reports were improperly authenticated. (*See* Dkt. No. 28 at 11–12.) Plaintiffs replied, submitting new evidence and filing a declaration by Colella to authenticate his reports. (*See* Dkt. Nos. 31 at 4–5, 8, 32-1 at 2, 33) (citing as new evidence an email from Defendant's Vice President of Operations, Rich Stoscez, to a Senior Executive Director of Lonmar, Ian Thomas, in which Stoscez states that "[e]quipment did not remove moisture during production process and product has developed mold and yeast."). Defendant has not objected to the contents of Plaintiffs' reply, so the Court considers these materials as authenticated and admissible for the purposes of summary judgment. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

1. EIMC and Lonmar Assessments

Plaintiffs do not seek summary judgment on the issue of EIMC and Lonmar's agency status, but raise the issue because it is relevant to the summary judgment inquiry. (*See* Dkt. No. 22 at 18–19.) Specifically, EIMC and Lonmar's agency status speaks to the binding effect of their respective assessments on Plaintiffs' coverage determination at issue. (*See id.*)

Agency is a consensual relationship, created by law but necessarily demonstrated by a principal's ability to control the agent and the agent's power to act on behalf of the principal. *Moss v. Vadman*, 463 P.2d 159, 164 (Wash. 1969). An agent needs actual or apparent authority to bind its principal to a contract. *Hoglund v. Meeks*, 170 P.3d 37, 44 (Wash. Ct. App. 2007). An agent has actual authority when the principal objectively manifests—through conduct, representations, or actions—this authority to the agent directly, either expressly or impliedly. *See King v. Riveland*, 886 P.2d 160, 165 (Wash. 1994). An agent has apparent authority when the principal objectively manifests this authority to a third party in a way that elicits a subjective belief of the agent's authority to act for the principal, so long as that belief is objectively reasonable. *Id.* The party asserting the existence of an agency relationship bears the burden of showing its existence. *Stansfield v. Douglas Cty.*, 27 P.3d 205, 215 (Wash. Ct. App. 2001).

The parties dispute the content of EIMC and Lonmar's assessments and the binding effect of those assessments on Plaintiffs' coverage determinations. Plaintiffs deny that EIMC and Lonmar had actual or apparent authority to make binding decisions on Plaintiffs' behalf regarding coverage of the Claim under the Policy. (*See* Dkt. No. 22 at 16–19.) Plaintiffs' contract with EIMC required EIMC to obtain Plaintiffs' approval regarding decisions on "coverage and quantum." (Dkt. No. 22 at 11.) Further, Colella submitted his reports "subject to the underlying insurance policy conditions and/or provisions of the law." (*Id.* at 17–18.) Plaintiffs' contract with Lonmar permitted Lonmar to act as Plaintiffs' agent "for the sole purpose of receiving and holding premium, claims and other monies . . ." and stated that "[n]othing in this Agreement shall grant [Lonmar] authority to accept, amend, or vary Insurance Business, settle, negotiate, or

compromise claims . . . and/or commit [Plaintiffs] in any way." (*Id.* at 11–12.)

Based on the express limiting language in Colella's report and in Plaintiffs' contracts with EIMC and Lonmar, the Court finds that Plaintiffs did not grant EIMC or Lonmar actual or apparent authority to decide, on Plaintiffs' behalf, whether the Claim was covered by the Policy. *See Hoglund*, 170 P.3d at 44; *King*, 886 P.2d at 165. Even so, this finding alone does not preclude the existence of a genuine dispute of material fact as to coverage of the Claim under the Policy. *Celotex*, 477 U.S. at 323–24. The Court may also look to EIMC's and Lonmar's assessments for evidence of a genuine dispute of material fact as to the cause of the mold.

### 2. Cause of Mold

Plaintiffs assert that the Claim is not covered under the Policy because the mold at issue was caused by a processing error because the spiral dryer did not malfunction, but "simply failed to extract the amount of moisture necessary to successfully complete [Defendant's] production of the bird seed." (Dkt. No. 22 at 8.) Plaintiffs draw this conclusion from Colella's reports, the email exchange between Stoscez and Thomas in which Stoscez allegedly acknowledges the existence of a processing error, and from the lack of dispute that the excess moisture issue "was completely cured as soon as [Defendant] switched back to using the conventional drying oven." (*See* Dkt. No. 31 at 5–7.) In response, Defendant argues that Plaintiffs misrepresent Colella's conclusions by ignoring his "finding that the spiral dryer 'failed' to function properly, which was an 'external cause.'" (Dkt. No. 28 at 13.) Defendant submits email correspondence indicating that EIMC and Lonmar "strongly disagree[d] with [Plaintiffs'] conclusion that this was an error in processing. It was not a new process, only a new piece of equipment that failed." (*See* Dkt. No. 29-6 at 2; *see also* Dkt. No. 29-7 at 2.) Defendant further argues that because only 28 percent of the pressed seed product developed mold, the spiral dryer likely malfunctioned intermittently, which is potentially an external cause that Plaintiffs did not address in their summary judgment briefing. (*Id.* at 13–14.) Defendant also contends that its ongoing investigation has revealed that atmospheric conditions exceeding 80 percent humidity are a likely cause of the mold, which was

not investigated by Colella. (*Id.* at 8.)

The parties have thus submitted competing evidence that relates to the cause of the mold at issue—specifically, whether the mold was caused by the spiral dryer's failure to perform as desired, and whether this failure is a "processing error" under the exclusion clause. The facts as to the cause of the mold are material because they relate to whether the Claim is covered under the Policy, which is the central issue in this case. *See Anderson*, 477 U.S. at 248. Contrary to Plaintiffs' argument that Stoscez's "production process" statement contradicts Defendant's evidence suggesting alternative causes, the Court sees the evidentiary contradictions here as demonstrative of factual disputes. *See State Farm Mut. Auto. Ins. Co. v. Treciak*, 71 P.3d 703, 706 (Wash. Ct. App. 2003); (Dkt. No. 31 at 4–5.) Therefore, there is a genuine dispute of material fact regarding the cause of the mold and thus whether the Claim is covered under the Policy. *See Anderson*, 477 U.S. at 248.[2] Therefore, Plaintiffs' motion for partial summary judgment regarding the Claim's lack of coverage under the Policy is DENIED.

Additionally, Plaintiffs seek summary judgment on Defendant's breach of contract and IFCA counterclaims because the Policy "plainly bars coverage for [Defendant's] claim" and Plaintiffs have not "unreasonably denied coverage." (Dkt. No. 22 at 19–20.) To conclude as such requires a thorough analysis of the Policy to determine whether Plaintiffs properly denied coverage of the Claim. (*See id.*) In light of the factual questions as to the cause of the mold and the applicability and proper interpretation of the Policy provisions, the Court has no grounds to dismiss those counterclaims. Accordingly, Plaintiffs' motion for partial summary judgment on Defendant's breach of contract and IFCA counterclaims is DENIED.

---

[2] Accordingly, the Court need not address the contract interpretation issues raised by the parties because factual questions remain as to the cause of the mold at issue, and it is premature to determine which contractual provisions (*e.g.*, the all-risk language, exclusion clause, or atmospheric conditions clause) apply in this case. *See supra* Section I.B. Questions also remain regarding where or when the mold was discovered during the production and distribution process, which could determine which contract provisions are relevant. *See supra* Section I.A.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment (Dkt. No. 22) is DENIED. Defendant's request to continue the motion pursuant to Federal Rule of Civil Procedure 56(d) is DENIED.

DATED this 2nd day of August 2019.

_John C. Coughenour_
John C. Coughenour
UNITED STATES DISTRICT JUDGE